## Gillespie's Estate

Before Van Dusen, P. J., Stearne, Sinkler, Klein, Bolger, and Ladner, JJ.

*William C. Ferguson, Jr.*, for exceptant.

*John B. Gest*, of *Donahue, Irwin, Merritt & Gest*, contra.

KLEIN, J., February 23, 1940.—Thomas Gillespie, decedent, died in 1895, leaving a large estate, which consisted, inter alia, of 55 pieces of real estate and more than a hundred ground rents. He appointed his son, James Leiper Gillespie, executor and trustee of his will, by the terms of which Elizabeth Gillespie, decedent's widow, was to receive the income from the residuary estate for her life. Upon her death the trust was to continue for a period of three years. Thereafter, one ninth of the principal was left to James L. Gillespie absolutely, and the balance in trust for other designated children and grandchildren, with additional provisions not necessary to recite, except to state that under certain conditions the said James L. Gillespie was entitled to a further share of the principal.

In 1901, the parties in interest, being dissatisfied with the manner in which the estate was being administered by James L. Gillespie, instituted proceedings for his removal. While these proceedings were pending, he voluntarily resigned and the Real Estate Title Insurance & Trust Company and Michael Francis Doyle, Esq., were appointed substituted trustees.

Shortly thereafter, in the same year, James L. Gillespie filed two accounts, one as executor and the other as trustee. The trustee's account debited the accountant, in addition to the sum of $11,721.56 received from himself as executor, with $19,700, representing the extinguishment of 20 of the ground rents, and $1,117.58, representing the sale of three pieces of real estate. The income account took credit for $62,492.92 payments on account of distribution, alleged to have been made to the widow, which resulted in an overpayment of income of $17,-722.87. The life tenant denied that she received this income and sought to surcharge the accountant. After considerable testimony was taken the accountant agreed that "credits in distribution should be reduced, because not vouched, by $17,500." As a net result of the adjustments made by Judge Penrose in his adjudication, a balance of

principal of $22,158.27 was found to be due the estate by the accountant, and this sum was ordered paid by him to the substituted trustees. He failed to comply with this order and was committed to prison for contempt, where he remained until he was discharged by proceedings under the State insolvent laws.

At the re-audit of the present account, a claim was presented against the share of the principal presently distributable to the estate of James L. Gillespie (who is now deceased) by the administrator d. b. n. c. t. a. of the estate of Elizabeth B. Gillespie, the widow, in the sum of $6,627.10, representing unpaid interest due on the original surcharge. Mr. Gest, attorney for Natalie Gillespie, administratrix c. t. a. of the estate of James L. Gillespie, deceased trustee, contends that certain credits should be allowed in reduction of this claim. He maintains that the record discloses that no credit on the principal surcharge of $22,158.27 was allowed to James L. Gillespie for mortgages of the value of $3,500, which he turned over to the substituted trustees on July 8, 1902, and which appeared in their account adjudicated October 10, 1904. He also claims that his client is entitled to credit for the further sum of $2,069.73, representing an overpayment of income fixed by Judge Penrose in his adjudication.

The learned auditing judge refused to allow the credit for the apparent overpayment of income holding "the death of both parties and the great lapse of time make the determination of the true facts impossible, and the claim to set off must be dismissed because of presumption of payment." However, he held that the claim of the deceased mother's estate should be reduced by allowing a credit for interest at six percent on $3,500 from March 5, 1902, to the date of her death, which was November 2, 1917. In our opinion this was error. We believe that both requests for credits must be refused.

The auditing judge, relying upon Kellerman's Estate, 242 Pa. 3 (1913), and Reamer's Estate, 331 Pa. 117

(1938), held that the rule of res judicata does not extend to a question of law when another and distinct fund is to be distributed though it be part of the same fund and the controversy is between the same parties. We think that these cases are not applicable to the present situation. If a mistake exists here, it does not involve a question of law, but a question of fact, to wit, was the amount of the original surcharge reduced in 1902 by the delivery of $3,500 in mortgages to the substituted trustees.

Prior to Stetson's Estate, 305 Pa. 62 (1931), there was considerable uncertainty as to whether the orphans' court had authority, after the passage of five years from the date of confirmation of an account, in the exercise of its inherent powers, to correct a mistake shown to exist in such account. But Stetson's Estate, supra, definitely settled the question and holds that, in the absence of fraud, the limitation of five years set forth in section 48 of the Fiduciaries Act of June 7, 1917, P. L. 447, applies whether the review is sought under this section of the act or under the inherent power of the orphans' court. Therefore, if a mistake was made in the present case, more than five years having elapsed since it occurred, and no allegation of fraud having been made, the orphans' court is without authority to correct the error.

In the present case, however, an additional factor must be considered which serves as a complete bar to the allowance of the requested credit in the present proceedings. In 1922, the substituted trustees filed a petition in this court for a writ of attachment sur judgment against James L. Gillespie, attaching his interest in this estate, under section 18(a)4 of the Orphans' Court Act of June 7, 1917, P. L. 363, which provides as follows:

"Whenever any person, against whom a decree for the payment of money has been made by any orphans' court, is possessed of or entitled to any stock, deposits, or debts due him, or to any legacy or interest in the estate of a decedent, the same may be levied on or attached in satisfaction of such decree, by the same process and in the same

manner as is now or may hereafter be provided by law in the case of judgments of any court of common pleas."

The writ of attachment was issued on a judgment based on a real debt of $22,158.27, with interest at six percent from March 5, 1902, and duly served on Gillespie. Gillespie never took any steps in his lifetime to challenge the attachment or the amount of the judgment. The amount of the judgment was therefore conclusively fixed in 1922, and has the same force and effect as a judgment regularly obtained in the common pleas court or any other court of record. The matter became res judicata and the judgment cannot be controverted or inquired into in a collateral proceeding such as an audit of a subsequent account filed by the succeeding trustees. The auditing judge was, therefore, without authority, at the audit held before him, to determine that the amount of the judgment should have been reduced by an alleged payment of $3,500 in 1902, 20 years prior to the attachment.

The auditing judge assumed that an error has been made in not allowing the original trustee credit for the transfer of the mortgages aggregating $3,500. We are not convinced that such an error has been made. On the contrary, a study of the record is persuasive that no such credit is actually due. No witnesses were called before the auditing judge, although Mr. Doyle, one of the original substituted trustees, is still acting as fiduciary and could have been called to explain the circumstances of the original transfer. The auditing judge relied entirely upon the figures which appear in the adjudication and schedule of distribution approved by Judge Penrose.

A closer examination of Judge Penrose's adjudication discloses that there are other items which were left undisposed of and unsettled. For example, commissions of $520.64, being at the rate of two and one-half percent on the ground rents extinguished and proceeds of the sale of real estate, were claimed at the original audit. Judge Penrose said:

"They will be allowed unless the balance of principal shown by the account as filed shall not be forthcoming when required, in which case of course they will be disallowed."

It is obvious that the balance was not "forthcoming when required". Yet the record fails to disclose, at any place, that this item of $520.64 was replaced by the accountant.

It must also be remembered that, in addition to the items accounted for by James L. Gillespie, he had in his charge more than fifty pieces of real estate and about eighty other ground rents. It is improbable, in view of the careless manner in which the estate was managed by him, that all these items could have been turned over to the succeeding trustees without considerable adjustments in interest, rents, carrying charges, and miscellaneous expenses, all of which adjustments could have been made outside of the formal accounting as an offset to any credits to which Gillespie may have been entitled.

But even more persuasive of the conclusion that claimant is not entitled to the credit now claimed is the fact that, although the question of the amount of this surcharge has been presented to this court on many occasions in the lifetime of James L. Gillespie, he never questioned the amount due thereon. Even his administratrix, who is now claiming on behalf of his estate, failed to ask for this credit at the original audit of the present accounting before Judge Bolger. The question was raised for the first time, apparently, as an afterthought at the re-audit.

A brief analysis of what has taken place in the past in this estate will be helpful.

Following the death of the widow in 1917, the trustees filed their fourth account, which was audited by Anderson, J. In his adjudication dated March 13, 1918, he said:

"As appears from the petition for distribution the said James Leiper Gillespie . . . was surcharged on his trustee's account with the sum of $22,158.27 . . . *As repre-*

*sented to the auditing judge this surcharge has never been repaid to the estate."* (Italics supplied.)

This account contained no income accrued after the date of the widow's death, so the question of the interest of James L. Gillespie in the estate was not before the court, but the record indicates that he received actual notice of the audit.

The residue was then held intact for a period of three years following the widow's death as provided in the will, and then another account was filed, which came on for audit before Lamorelle, P. J.

At this audit, James L. Gillespie, as well as his wife, who is now claiming on behalf of his estate, appeared personally in court and testified. The amount of the surcharge was not questioned before Judge Lamorelle, but the question was raised whether the defaulter's share of principal and income could be applied to its payment. All parties seemed to have assumed that the surcharge remained unchanged at the original amount of $22,158.27. Judge Lamorelle ruled that James L. Gillespie's share must be applied on account of the surcharge and an appeal was taken to the Supreme Court, reported in 273 Pa. 227. Mr. Justice Walling, who wrote the opinion, stated at page 229:

"Thereafter he [James L. Gillespie] filed an account, the adjudication of which in 1902 showed him indebted to the estate in the sum of $22,158.27, for misappropriation of its funds, *no part of which was ever repaid.*" (Italics supplied.)

The next audit took place before Judge Henderson, who filed his adjudication on April 28, 1926. At the time of this audit a claim was made under the attachment secured by the substituted trustees by Rebecca Gillespie, executrix under the will of her mother, Elizabeth Gillespie, for interest on the surcharge from January 19, 1902, to the date of the death of Elizabeth Gillespie on November 2, 1917. This interest claim was made in the sum of $20,817.69. Although James L. Gillespie was

represented by counsel at this audit, all calculations involving the division of his share among the other legatees were made on the original amount of the surcharge ($22,-158.27), and the question of the alleged reduction by the transfer of $3,500 in mortgages was not raised or presented to the court.

The question of the amount of the surcharge was again before the court at the audit of the trustees' seventh account audited by Marx, P. J., specially presiding. Judge Marx, in his adjudication dated April 12, 1933, said:

"By the adjudication filed January 20th, 1902, the trustee, James Leiper Gillespie, was surcharged with the sum of $22,158.27 . . . *No part of the surcharge was paid during the lifetime of the widow.*" (Italics supplied.)

It can be seen, therefore, that although specific reference was made to the amount of the surcharge at four different audits over a period of many years, at which proceedings James L. Gillespie was either present in person or represented by counsel, or else had actual notice of the audits, he made no objection to the amount thereof and never requested credit for the $3,500 claim now being presented. Only one conclusion can be drawn from these circumstances, and that is that James L. Gillespie was satisfied at the time of these various audits that $22,158.27 represented the correct amount of principal surcharge due by him to his father's estate. For us, at this late date, after the death of the principals to the transaction, to attempt to restate or readjust the figures of 1902 would be a serious mistake, even if we had the authority to make such corrections. Therefore, the exceptions are sustained, and the claim of Edmund H. Gillespie, administrator d. b. n. c. t. a. of the estate of Elizabeth Beck Gillespie, deceased, is allowed in the sum of $6,627.10 as claimed. In all other respects the adjudication and supplemental adjudication are confirmed absolutely.

Bolger, J., dissents.